William A. Rossbach
ROSSBACH HART, P.C.
401 North Washington Street
Missoula, MT 59807
Phone: (406) 543-5156
bill@rossbachlaw.com

Amy Radon
Leslie A. Bailey
PUBLIC JUSTICE, P.C.
555 Twelfth Street, Suite 1620
Oakland, CA 94607
Phone: (510) 622-8150
aradon@publicjustice.net
lbailey@publicjustice.net
(*Pro hac vice* admissions pending)

Richard Ramler
RAMLER LAW OFFICE, P.C.
202 West Madison Ave.
Belgrade, MT 59714
Phone: (406) 388-0150
RichardRamler@aol.com

*Attorneys for Intervenor Richard
Barber*

**FILED**

**SEP 2 1 2011**

PATRICK E. DUFFY, CLERK
By_____
DEPUTY CLERK, MISSOULA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE  DIVISION

| | |
|---|---|
| LOUIS ALEKSICH, RAINELLE ALEKSICH, and BRENT ALEKSICH, <br><br> Plaintiffs, <br><br> v. <br><br> REMINGTON ARMS CO., INC., and E. I. DuPONT DE NEMOURS & CO., <br><br> Defendants. | Cause No. CV-91-5-BU-PGH <br><br> **BRIEF IN SUPPORT OF RICHARD BARBER'S MOTION TO INTERVENE** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................... I

INTRODUCTION ............................................................................... 1

FACTUAL BACKGROUND ................................................................ 5

INTERESTS OF MOVANT ................................................................. 9

ARGUMENT ...................................................................................... 15

INTERVENTION IS WARRANTED BECAUSE MR. BARBER MEETS
BOTH PREREQUISITES FOR PERMISSIVE INTERVENTION UNDER
FEDERAL RULE OF CIVIL PROCEDURE 24(B). ............................... 15

I.      MR. BARBER'S MOTION TO INTERVENE IS TIMELY. ......... 16

        A.      The "Stage of the Proceedings" Factor Counsels in Favor of
                Granting Mr. Barber's Motion to Intervene Because
                Intervention to Unseal Court Records is Proper Long After a
                Case Has Been Terminated.............................................. 16

        B.      The Absence of Prejudice to the Existing Parties Counsels in
                Favor of Granting Mr. Barber's Motion to Intervene........... 19

        C.      The Ongoing Public Safety Concerns Implicated by the Model
                700 and Remington's Failure to Cease Production of the
                Dangerous Fire Control Counsel in Favor of Granting Mr.
                Barber's Motion. .......................................................... 20

II.     MR. BARBER'S MOTION TO INTERVENE SHARES A
        QUESTION OF LAW OR FACT IN COMMON WITH THE MAIN
        ACTION.......................................................................... 21

CONCLUSION ................................................................................... 24

TABLE OF AUTHORITIES

**Cases**

*Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470
(9th Cir. 1992) ............................................................... 15, 16, 17, 22, 23

*Bromgard v. Montana*, No. CV-05-BLG-RFC-CS, 2007 WL 2710379
(D. Mont. Sept. 13, 2007)........................................................................ 3

*Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165 (6th Cir. 1983) ......... 3

*Equal Employment Opportunity Comm'n v. Nat'l Children's Center, Inc.*,
146 F.3d 1042 (D.C. Cir. 1998) ...................................................... 17, 21

*Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003) ................. 18

*Freedom From Religion Found., Inc. v. Geithner*, 644 F.3d 836
(9th Cir. 2011) ....................................................................................... 16

*In re Beef Indust. Antitrust Litig.*, 589 F.2d 786 (5th Cir. 1979) ........................... 22

*Jessup v. Luther*, 227 F.3d 993 (7th Cir. 2000),........................................... 22, 23

*Kamakana v. City & County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006)......... 3, 23

*Kinzer v. Remington Arms Co.*, W.D. Okla. No. 5:09-cv-01242-R ........................ 14

*NAACP v. New York*, 413 U.S. 345 (1973) ............................................................. 17

*Oregonian Pub. Co. v. U.S. Dist. Court for Dist. of Oregon*, 920 F.2d 1462
(9th Cir. 1990) ......................................................................................... 4

*Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994) ................. 17, 20, 22

*Phillips ex rel. Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206
(9th Cir. 2002) ............................................................................... 4, 18, 19

*Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775 (1st Cir. 1988)................. 18, 19

*Rambo v. Remington Arms Co.*, Alaska Super. Ct. No. 3AN-10-10376 ................ 14

*Rushford v. New Yorker Magazine*, 846 F.2d 249 (4th Cir. 1988) ......................... 23

*San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096
(9th Cir. 1999) ............................................................... 3, 15, 16, 17, 21

*Shilhanek v. D-2 Trucking, Inc.*, 994 P.2d 1105 (Mont. 2000) ................................ 15

*United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424
    (10th Cir. 1990) .............................................................................. 17, 19

*Washington State Bldg. & Const. Trades Council, AFL-CIO v. Spellman*,
    684 F.2d 627 (9th Cir. 1982) ............................................................... 15

*Weiss v. Allstate Ins. Co.*, No. 06-3774, 2007 WL 2377116
    (E.D. La. Aug. 16, 2007) .................................................................... 24

**Statutes**

Federal Rule of Civil Procedure 24(b)(2) ........................................... 22, 23

Federal Rule of Civil Procedure 24(b) ................. 1, 5, 15, 16, 17, 19, 21, 22, 23, 24

Federal Rule of Civil Procedure 26(c) ................................................... 22

Montana Rule of Civil Procedure 24(b) ................................................. 15

## INTRODUCTION

Richard Barber moves to intervene pursuant to Federal Rule of Civil Procedure 24(b) for the limited purpose of seeking public access to the court record in *Aleksich v. Remington Arms Co.*, Cause No. CV-91-5-BU-PGH, which is sealed in its entirety. *Aleksich* involved an alleged malfunction in the trigger mechanism of a Model 700-series bolt-action rifle ("Model 700") that was designed and manufactured by Remington Arms Company ("Remington").[1]

On October 23, 2000, Mr. Barber's nine-year-old son, Richard Augustus "Gus" Barber, was mortally wounded when the family's Remington Model 700 rifle fired as his mother pushed the safety to the "off" position in order to unload the gun. She had not touched the trigger. Decl. of Richard Barber ("Barber Decl.") ¶ 5 (attached as Exhibit A).[2] In the wake of this tragic accident, Mr. Barber searched for answers. He soon discovered that the same fire control on his family's Model 700 rifle that had caused Gus's death was implicated in hundreds of other injuries and fatalities across the country.[3] *Id.* ¶¶ 6–12.

---

[1] At the time the *Aleksich* case was filed, Remington was being operated as a division of E. I. Dupont de Nemours & Co., and DuPont was also a defendant in the suit. For the sake of simplicity, both companies are referred to herein as "Remington."

[2] Mr. Barber's declaration is intended only to substantiate his interest in intervening and obtaining public access to the *Aleksich* court records. The factual questions of whether and why certain Remington rifles fire without a trigger pull or are defective are not at issue for purposes of this motion.

[3] The fire control is the part in the rifle's trigger mechanism that, when it functions correctly, permits the rifle to fire only when the trigger is pulled. Barber Decl. ¶ 18.

One of the first cases Mr. Barber learned about after Gus's death was the *Aleksich* product liability lawsuit. *Id.* ¶ 11. *Aleksich* arose after Brent Aleksich, then 14, was severely injured after a Remington Model 700 rifle being handled by his brother allegedly discharged without a trigger pull in 1988. *Id.* The case had settled five years before Gus's death.

As he grew to understand that his family's accident as not an isolated event, Mr. Barber decided to dedicate his life to gathering information about the Walker fire control and educating the public so that he could help prevent further loss of life and limb. *Id.* ¶¶ 13-14. Over the past eleven years, Mr. Barber has spent countless hours and personal funds researching and exposing the history, function, and design of the Model 700. *Id.* He has worked with Remington engineers to develop a safer trigger fire control design, and urged Remington to remove the old defective design from the market. *Id.* ¶¶ 29, 31-34. Because of his extensive understanding of the Model 700 and Remington's internal documents, Mr. Barber has become a vital resource for the press. Unsealing the *Aleksich* court files is an essential next step in Mr. Barber's mission to educate the public, and ultimately to persuade Remington to issue a warning or to remove these dangerous rifles from the market.

Recent decisions of the Ninth Circuit have emphatically held that the public has the right to "inspect and copy public records and documents, including judicial records and documents," and that court records may only be sealed where the proponent of sealing has "articulate[d] compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies

2

favoring disclosure." *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006) (internal quotation marks and citations omitted). The public's interest in access to court records is even stronger where, as here, the records at issue contain information relevant to public health and safety. *See Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1176 (6th Cir. 1983). Courts therefore regularly permit intervention by nonparties who seek to preserve that public right of access. *E.g.*, *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1099 (9th Cir. 1999) (nonparty could intervene to seek unsealing of police report on sexual harassment); *Bromgard v. Montana*, No. CV-05-BLG-RFC-CS, 2007 WL 2710379, *1 (D. Mont. Sept. 13, 2007) (nonparty could intervene to challenge protective order).[4] The Ninth Circuit has held that such intervention is proper even years after a case was terminated. *San Jose Mercury News*, 187 F.3d at 1100–01. This is especially true where, as here, the importance of public access to the record has become clear only recently.[5]

As this Brief explains, Mr. Barber's Motion to Intervene should be granted because: (1) the Motion has been timely filed; (2) intervention will not unduly delay or prejudice any rights the parties' may have in the underlying litigation, which has been settled for many years; and (3) the Motion shares a question of law or fact in common with the main action. Once Mr. Barber is permitted to intervene

---

[4] For the Court's convenience, all unpublished decisions are attached.

[5] Public Justice, counsel for Mr. Barber, has represented many other intervenors challenging the sealing of court records. *See* Declaration of Leslie A. Bailey, attached as Exhibit B.

3

in this case, he will then move to unseal the court record on the ground that continued secrecy of this case is improper under: (a) the federal common law, which provides that sealing is *only* permitted where the proponent of secrecy can demonstrate compelling reasons for secrecy supported by specific factual findings that outweigh the public's strong interest in access, *see Phillips ex rel. Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206 (9th Cir. 2002); (b) the First Amendment to the U.S. Constitution, where the public's right of access to court records can be "overcome *only* by an overriding right or interest 'based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest,'" *Oregonian Pub. Co. v. U.S. Dist. Court for Dist. of Oregon,* 920 F.2d 1462, 1465 (9th Cir. 1990) (emphasis added); and (c) judicial policy, *see* Administrative Office of the U.S. Courts, *Judicial Conference Policy on Sealed Cases* (Sept. 13, 2011), at

http://www.uscourts.gov/uscourts/News/2011/docs/JudicialConferencePolicyOnSe aledCivilCases2011.pdf (noting that sealing an entire court record should be an act of "last resort"). The grounds to support Mr. Barber's efforts to unseal the court record in this case will be explained in detail in briefing in support of his motion to unseal, which will be filed once this Court grants Mr. Barber permission to intervene. It is Mr. Barber's hope that once the information in the *Aleksich* court file is made public, Remington will finally have no choice but to issue an adequate safety warning, recall these fire controls from the market, and/or remove them from production altogether. For these reasons, and because Mr. Barber satisfies all

4

of the requirements for Rule 24(b) permissive intervention, this Court should grant Mr. Barber's Motion to Intervene.

## FACTUAL BACKGROUND

Very little is publicly known about the *Aleksich* case because the entire court file is sealed and there is no record of the case in this Court's docket.[6] Mr. Barber, however, learned about the case from one of his employees and from Richard Miller, the attorney who represented the plaintiffs in *Aleksich* and who would later represent Mr. Barber in his own lawsuit against Remington. Barber Decl. ¶¶ 6, 11, 15.[7]

After his son's death, Mr. Barber wanted to understand how this could have happened. As he spoke with other hunters and their families, he soon realized that his family's accident was not an isolated incident—and that many Model 700 malfunctions had been documented. *Id.* ¶¶ 6-13. He became determined to learn everything he could about the Model 700, decided to dedicate his life to shedding light on the hidden dangers of the Model 700. *Id.* ¶¶ 13-14.

As Mr. Barber explains in his declaration, he obtained copies of some of the *Aleksich* materials—including a redacted brief seeking sanctions against Remington for discovery abuses—from litigants in a different case who had received the documents before *Aleksich* was sealed. Barber Decl. ¶ 15. In addition, on a number of occasions in 2001, the clerk of this Court permitted Mr.

---

[6] A PACER search for the Aleksich case number returns the result "Sealed v. Sealed. This case is SEALED." *See* Exhibit C.

[7] Mr. Miller passed away in 2006.

5

Barber to review briefs and pleadings in the *Aleksich* file. *Id.* ¶ 16. In the course of that review, he learned that on the eve of trial, Remington had informed the plaintiffs' counsel that it had uncovered eight to twelve bankers' boxes of documents responsive to discovery requests filed three years prior. *Id.* To Mr. Barber's recollection, at least some of that discovery material was subsequently filed with the Court as attachments to pleadings, and therefore became part of the court record. *Id.* Only later, as he gained expertise about Remington rifles and the history of the Walker fire control, did Mr. Barber realize the significance of what he had seen, but when he returned to the courthouse to review the *Aleksich* file again in 2005, he was told that the files had been sealed from public access and shipped to storage off-site. *Id.* ¶¶ 37-38. Mr. Barber believes that the *Aleksich* court records were sealed at Remington's insistence in order to hide its misconduct from the public.[8] *Id.* ¶ 24.

Mr. Barber's declaration describes what he has learned about the design and history of the Model 700. *Id.* ¶¶ 18-22. Briefly, the Model 700's trigger mechanism (named the "Walker fire control" after its inventor, Remington lead engineer Mike Walker) was designed with an internal component called a "trigger connector," which is not used by any other rifle manufacturer. *Id.* ¶ 18-20.

---

[8] Because the entire *Aleksich* court record is sealed, it is not known whether, in addition to a sealing order, the record also contains a protective order that prevents dissemination of discovery materials. As explained above, once Mr. Barber is permitted to intervene in this action, he will then file a motion to unseal the court record so that he may inspect any protective order entered in this case, and may move to vacate or modify such an order at that time.

Because this connector is not stable and can become displaced, the rifle can fire *without the trigger being pulled. Id.* ¶ 19, 21-22.  This malfunction can occur when the rifle is jarred, dropped, when the rifle bolt is opened or closed, or—as what occurred in the Barber accident—when the safety is released in order to unload the rifle. *Id.* All of these types of unintended discharges result from the same defective condition—the susceptibility of the connector to be displaced from its proper position. *Id.*

The television network CNBC obtained a sample of the *Aleksich* court filings during the course of its ten-month investigation of the Walker fire control, and featured these filings in the CNBC Original Documentary "Remington Under Fire: A CNBC Investigation," which premiered October 20, 2010.[9] Among the documents CNBC profiled are the following:

- An internal memorandum from Remington's lead engineer Mike Walker, dated December 3, 1946, warning of a "theoretical unsafe condition" involving the Model 700's safety, which is the mechanism that is supposed to keep the gun from firing accidentally.

- An internal memorandum from a Remington test engineer, dated April 9, 1947, noting that the Model 700 could fire "by pushing the safety to the 'off' position," which was "very dangerous from a safety and functional point of view."

- An internal memorandum from Mike Walker, dated August 16, 1948, where Walker proposed a change in his original design that would have incorporated a blocking device to keep the Model 700's trigger mechanism from falling out of alignment.

---

[9] A DVD of the documentary as it aired on October 20, 2010 is attached as Exhibit 5 to Mr. Barber's Declaration.  Further information about the investigation and documentary are available online at http://www.cnbc.com/id/39554936/. Remington Under Fire was updated and re-aired by CNBC on August 5, 2011.

- A 1948 internal memorandum from Remington executives, noting that Walker's proposed change to incorporate a blocking device "is the best design," but concluding that "its disadvantages lay in the high expenditure required to make the conversion," which—according to the same memorandum—would have been 5.5 cents per gun.

- A memorandum from Remington's patent attorney, dated August 31, 1948, noting, "Our usual potential liability for the safety of our product is augmented somewhat by our knowledge that some Model 721 safeties have misfunctioned [sic] . . . . However, our liability does not seem out of proportion to the advantage of retaining the present . . . construction, pending receipt of further complaints from the field."[10]

- An internal memorandum from a Remington research manager, dated March 18, 1975, noting that Remington "could duplicate" the fire control problems on a Model 700 rifle that had been returned to the factory.[11]

In response to CNBC's investigation, Remington issued a statement asserting that "[t]he Model 700, including its trigger mechanism, has been free of any defect since it was first produced . . . ."  Remington Arms, *Official Statement for CNBC Program Regarding the Model 700* (Sept. 7, 2010), *available at* http://www.cnbc.com/id/39554936/ (follow "Remington's Official Statement to CNBC" hyperlink).

---

[10] The Model 721, like all other Remington bolt-action rifles, has the same Walker fire control as the Model 700.  Barber Decl. ¶ 20.

[11] Copies of these documents are available by following hyperlinks embedded in CNBC's *Remington Under Fire* investigation webpage.  *See* Scott Cohn, *Documents Reveal Remington Wrestled with Potential Gun Safety Problems for Decades* (Jan. 18, 2011), *at* http://www.cnbc.com/id/39759366/.

## INTERESTS OF MOVANT

Mr. Barber has a specific and compelling interest in intervening in this case in order to obtain public access to the *Aleksich* court filings.

Since his son Gus's death eleven years ago, through his own efforts and at great personal expense, Mr. Barber has collected and analyzed information about the Walker fire control—and Remington's knowledge of its propensity to malfunction—from sources across the country. *Id.* ¶¶ 13-18. He has personally reviewed millions of pages of internal Remington documents, memos, meeting minutes, testing records, research and development records, customer complaints, legal briefs, and other documents. *Id.* He has spoken with countless individuals who have personally experienced Walker fire control malfunctions, and he has been contacted by other families who have lost loved ones due to a Remington rifle firing without a trigger pull. *Id.* ¶¶ 6-12.

Through researching Remington's history and speaking with victims and their attorneys, Mr. Barber learned that Remington has settled virtually every claim against it on the condition that the evidence of the Walker fire control malfunctions be kept confidential. *Id.* ¶¶ 7, 24, 42. He believes that if Remington had not been able to hide this information from the public through the use of protective orders and secret settlements, his son Gus—and countless others—would still be alive today. *Id.* ¶¶ 14, 42.

As he began to understand the extent of the safety issues with the Walker fire control—and the ways in which Remington has hidden them—Mr. Barber came to believe that he was morally obligated to use this knowledge to educate

others, so that no other family has to go through the agony his family has had to endure. *Id.* Frustrated at how Remington had used the civil justice system to hide the truth about its dangerous rifles, Mr. Barber proposed a bill to Montana's legislature that would bar state courts from entering orders concealing a public hazard. *Id.* ¶ 36. The law, passed and signed into law in 2005, is known as the "Gus Barber Anti-Secrecy Act." *Id.*

As early as February 2001—within four months after the tragic loss of his son—Barber made his journalistic intent clear, as documented by CBS: "My ultimate goal in all this is to bring an awareness [to] educate people . . . . [I]f Remington is not willing to take care of the problem, then at least give the people an understanding [of] what the problem is." Jim Stewart, *Richard and Barbara Barber Interview*, CBS Evening News (Feb. 6, 2001). Barber Decl. ¶ 27 & Ex. 4. In fact, as the *Bozeman Daily Chronicle* reported, Mr. Barber delayed filing a lawsuit against Remington after Gus's death "because he [did not] want to be gagged. He wants to talk about his son, the accident, and the questionable history of the Remington 700." Kathleen O'Toole, *Remington Under Fire: After Fatal Accident, Family Back to the Hunt*, Bozeman Daily Chronicle (Dec. 2, 2001). *Id.* ¶ 30 & Ex. 8. The article goes on to explain that, "[s]ince the accident, Barber repeatedly contacted the offices of local and national newspapers and magazines, television and radio stations, local, state and national governments. He's been successful at getting the history of the Remington 700 into print and on the air, even having his story broadcast nationally on CBS and CNN with promises of follow-ups." *Id.*; *see also* Kathleen O'Toole, *Family Sues Gun Maker*, Bozeman

10

Daily Chronicle (Feb, 18, 2002) (explaining that Barber's "'agenda' is totally different from other litigants, [in] that for the past year he's concentrated on informing and educating the public about the gun and its perceived defects"). *Id.* ¶ 30 & Ex. 9. Mr. Barber has also used his understanding of Remington bolt action rifles to teach safer gun practices to his fellow hunters. *Id.* ¶¶ 3, 25.

Because of his unrivalled understanding of the issues, Mr. Barber has become the preeminent source for members of the press seeking information about the Walker fire control defects, Remington's knowledge of the fire control defects, and Remington's attempts to sweep this public safety hazard under the rug. He has been interviewed for countless news stories and featured in articles and television programs by *USA Today*, CBS Evening News, CNBC, *The Bozeman Daily Chronicle*, *The Billings Gazette*, *The Missoulian*, and *The Ravalli Republic*, among many others. *Id.* ¶¶ 27-28.

In addition to using the knowledge he gained to raise public awareness, Mr. Barber sought to convince Remington to make their rifles less dangerous. *Id.* ¶¶ 29-34. First, using his wrongful death lawsuit against the company as leverage, he persuaded Remington to remove the dangerous "bolt lock" feature that had caused Gus's death. *Id.* ¶¶ 30-31. The design of these rifles—his family's rifle among them—forced the gun handler to release the safety in order to unload the gun, resulting in a malfunction Remington called "fire on safety release" or "FSR." *Id.* ¶¶ 21-22. By the time Remington stopped making Model 700s with the bolt lock in February 1982, 2.5 million of these rifles had been produced. At Mr. Barber's insistence, Remington agreed to institute a "Safety Modification Program."

11

Through this program, rifle owners nationwide could have the bolt lock removed. *Id.* ¶ 31 & Ex. 10.

Mr. Barber's ultimate goal was and is to convince Remington to cease production of the Walker fire control altogether and replace it with a safer design. *Id.* ¶¶ 29, 32, 41. To that end, he has worked with Remington engineers to develop a trigger mechanism that would do away with the problematic trigger connector in the Walker design. *Id.* ¶¶ 32-34. He was invited by Remington's then-CEO, Tommy Millner, to provide feedback on the strength and weaknesses of design proposals, to inspect models at Remington's Research and Development facility in Kentucky, and to evaluate prototypes. *Id.* ¶¶ 33-34. With Mr. Barber's input, Remington ultimately developed a new design that used a trigger blocking mechanism that lead engineer Mike Walker had originally proposed in 1948. *Id.* ¶¶ 32-34. Mr. Millner assured Mr. Barber that once the new design—named the X-Mark Pro—went into production, it would replace the Walker fire control. *Id.* ¶ 32.

Mr. Barber did not know until he saw the CNBC special "Remington Under Fire" in Fall 2010 that Remington had failed to make good on its promise to cease production of the defective fire control that killed Gus. *Id.* ¶ 35. As CNBC reported, "because Remington still contends the old Walker trigger is safe, it continues to use it in rifles including the current version of the Remington 770, as well as earlier 700 series models still sold by retailers worldwide." *See* Scott Cohn, *Documents Reveal Remington Wrestled with Potential Gun Safety Problems for Decades* (Jan. 18, 2011), *available at*

12

http://www.cnbc.com/id/39759366/page/3/.  When he learned that Remington was actually still manufacturing and selling rifles with the Walker fire control, Mr. Barber vowed to redouble his efforts to expose the dangers associated with that design in order to force Remington to take the necessary steps to remove it from the hands of the unsuspecting public. Barber Decl. ¶ 35.

Mr. Barber has a compelling interest in the *Aleksich* case in particular because of what he believes that court record contains.  He believes that the time has come for the public to know how Remington has used court secrecy to avoid accountability and avert public pressure to recall the dangerous rifles.  By obtaining access to the sealed court record in *Aleksich*, Mr. Barber hopes to draw greater attention to the dangerous nature of the Walker fire control; to expose the extent of Remington's extraordinary efforts to keep the hazards of its best-selling guns a secret; and, ultimately, to ensure that tragedies like the death of nine-year-old Gus Barber will not befall other families in the future. *Id.* ¶ 41-42.  The experiences of the Barbers and the Aleksiches are not isolated incidents; as CNBC reported, there have been "thousands" of complaints from customers about the Model 700 inadvertently misfiring, and there will undoubtedly be more in the future unless Remington takes the necessary precautions to cure the Walker fire control defects.  Scott Cohn, *Deaths, Injuries and Lawsuits Raise Questions about Popular Gun's Safety* (Oct. 20, 2010), *available* at

http://www.cnbc.com/id/39740539;[12] *see also* Declaration of Timothy M. Monsees (attached as Exhibit D), Ex. 1 (plaintiff's Exhibit 9 in *Williams v. Remington Arms Co.*, listing over 960 customer complaints involving inadvertent discharges of the Model 700).  As Mr. Barber notes in his declaration, he continues to hear about deaths and injuries caused by Remington's Walker fire control year after year. Barber Decl. ¶¶ 39-42.

Although there has been a significant amount of litigation involving the Model 700's defects, to Mr. Barber's knowledge none of the other cases against Remington involved as voluminous of a record as *Aleksich* or the extreme measures Remington has taken here to keep the proceedings secret.[13]  Moreover, the Aleksich family is not opposed to Mr. Barber's efforts to intervene and unseal the court record in this case. *See* Declaration of Louis Aleksich, dated June 17, 2011 (Exhibit A to Motion to Intervene).  For all of these reasons, Mr. Barber has a powerful interest in intervening in order to unseal the court record in *Aleksich*.

---

[12] A sampling of the complaints CNBC obtained is available at http://msnbcmedia.msn.com/i/CNBC/Sections/CNBC_TV/CNBC_US/Shows/_Do cumentaries_Specials/Remington_Under_Fire/Documents/Rem_Doc_06.pdf.

[13] There are believed to be several other lawsuits currently pending against Remington involving the same Walker fire control issues. *See, e.g., Kinzer v. Remington Arms Co.*, W.D. Okla. No. 5:09-cv-01242-R); *Rambo v. Remington Arms Co.*, Alaska Super. Ct. No. 3AN-10-10376.

## ARGUMENT

## INTERVENTION IS WARRANTED BECAUSE MR. BARBER MEETS BOTH PREREQUISITES FOR PERMISSIVE INTERVENTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 24(B).

Nonparties who seek to obtain public access to a court record in a civil case may do so by seeking permissive intervention under Federal Rule of Civil Procedure 24(b). *San Jose Mercury News*, 187 F.3d at 1100; *see also Beckman Indus., Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 472 (9th Cir. 1992) (noting the "ample support" for recognizing Rule 24(b) intervention "as a proper method to modify a protective order") (listing cases). The Ninth Circuit has instructed that Rule 24 should be construed liberally "in favor of applicants for intervention." *Washington State Bldg. & Const. Trades Council, AFL-CIO v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982); *cf. Shilhanek v. D-2 Trucking, Inc.*, 994 P.2d 1105, 1113–14 (Mont. 2000) (affirming trial court's order granting permissive intervention of nonparty under Mont. R. Civ. P. 24(b) for limited purpose).[14]

Pursuant to that Rule 24(b), the Ninth Circuit has identified two prerequisites for allowing a nonparty to permissively intervene to seek public access to a sealed court record: (1) the motion to intervene must be timely; and (2) the motion must raise a question of law or fact in common with the main action.

---

[14] Fed. R. Civ. P. 24(b) states, in relevant part, "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact . . . . [T]he court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."

15

*Beckman*, 966 F.2d at 473; *San Jose Mercury News*, 187 F.3d at 1100.  As explained below, both of these prerequisites are met here.[15]

## I.     MR. BARBER'S MOTION TO INTERVENE IS TIMELY.

Courts in the Ninth Circuit consider three factors to determine whether a motion to intervene is timely: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *San Jose Mercury News*, 187 F.3d at 1100–01.  All three factors here show that Mr. Barber's motion is timely.

### A.     The "Stage of the Proceedings" Factor Counsels in Favor of Granting Mr. Barber's Motion to Intervene Because Intervention to Unseal Court Records is Proper Long After a Case Has Been Terminated.

Although the proceedings in *Aleksich* have long been terminated, this factor counsels in favor of granting Mr. Barber's motion.

---

[15] Where a nonparty seeks permissive intervention pursuant to Rule 24(b) to litigate a claim on the merits—as opposed to merely seeking public access to sealed court records—the Ninth Circuit requires a third factor: an independent jurisdictional basis for the intervention. *Beckman*, 966 F.2d at 473; *San Jose Mercury News*, 187 F.3d at 1100.  An independent jurisdictional basis is *not* required where, as here, the intervenor "does not seek to litigate a claim on the merits." *Beckman*, 966 F.2d at 473 ("Intervenors do not ask the district to rule on additional claims or seek to become parties to the action. They ask the court only to exercise that power which it already has, *i.e.*, the power to modify the protective order. For that reason, no independent jurisdictional basis is needed.") (listing cases); *Freedom From Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011) (noting that "the independent jurisdictional grounds requirement" is not applicable when the intervenor does not seek to raise new claims).  Accordingly, Mr. Barber need not demonstrate an independent jurisdictional basis in order to be granted permissive intervention in this case.

As the Third Circuit explained, there is a "growing consensus among the courts of appeals that intervention to challenge confidentiality orders may take place long after a case has been terminated." *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 779 (3d Cir. 1994) (listing cases). In *Beckman,* for example, intervention to challenge a protective order was allowed approximately two years after the underlying case was terminated, 966 F.2d at 471, 473, and the Ninth Circuit has noted that "delays measured *in years* have been tolerated where an intervenor is pressing the public's right of access to judicial records." *San Jose Mercury News,* 187 F.3d at 1100–01 (emphasis added); *see also Equal Employment Opportunity Comm'n v. Nat'l Children's Center, Inc.,* 146 F.3d 1042, 1047 (D.C. Cir. 1998) (holding that motion to intervene to challenge post-judgment confidentiality filed over two years after parties had settled was timely, noting "intervention to challenge confidentiality orders may take place long after a case has been terminated"); *United Nuclear Corp. v. Cranford Ins. Co.,* 905 F.2d 1424, 1427 (10th Cir. 1990) (allowing intervention three years after judgment for the same reason); *see generally NAACP v. New York,* 413 U.S. 345, 365–66 (1973) ("Timeliness is to be determined from all the circumstances," and "the point to which the suit has progressed . . . is not solely dispositive."), *quoted in United Nuclear,* 905 F.2d at 1427. Although Rule 24(b) "encompasses the basic fairness notion that intervention should not work a 'last minute disruption of painstaking work by the parties and the court,'" this sort of "disruption" is not at issue where the intervenor seeks "to litigate only the issue of the protective order," which is "a particularly discrete and ancillary issue." *Public Citizen v. Liggett Group, Inc.,*

17

858 G.2d 775, 786 (1st Cir. 1988) (citation omitted).  In these types of cases

permissive intervention should be granted.  *Id.*

      One court in the Ninth Circuit explained that the timeliness requirement of

Rule 24(b) "should be greatly relaxed" when the intervenor seeks only to challenge

a confidentiality order in a case that has already been terminated.  *Phillips v.*

*Goodyear Tire & Rubber Co.*, 2007 WL 3245015, *6 (S.D. Cal. Oct. 31, 2007)

(adopting magistrate's report & recommendation).  In that case, the court noted

that "[a]llowing applicants to intervene for that limited purpose will not delay this

action at all, since *it has been closed for approximately four years post-settlement*

*and dismissal . . . ." Id.* at *7 (emphasis added).  The court ultimately held that the

"limited task" of opposing the nonparty's request for modification of the protective

order was not the type of disruption that counseled against granting the nonparty's

motion to intervene.  *Id.*

      Here, the fact that the *Aleksich* case was settled years ago should not pose an

obstacle to Mr. Barber's intervention in this case; given that proceedings are no

longer ongoing, unsealing the court record could not possibly "work a last minute

disruption" of the case.  Rather, permitting Mr. Barber's intervention will merely

provide a vehicle by which this Court can ascertain whether there is any valid basis

to keep the *Aleksich* court file sealed—a determination the Court is legally required

to make.  *See, e.g., Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1139

(9th Cir. 2003) (ordering the immediate release of specified documents to the

public "along with all other court records for which compelling reasons for secrecy

have not been demonstrated").  Accordingly, the first timeliness factor—regarding

the stage of the proceedings in which an applicant seeks to intervene—counsels in favor of granting Mr. Barber's request for permissive intervention.

### B.     The Absence of Prejudice to the Existing Parties Counsels in Favor of Granting Mr. Barber's Motion to Intervene.

As the Tenth Circuit has explained, courts apply timeliness rules "to prevent prejudice in the adjudication of the rights of existing parties." *United Nuclear*, 905 F.2d at 1427.  But when the proposed intervention is for a "collateral purpose"— like challenging confidentiality—that "concern [is] not present." *Id.* (citations omitted).  There is no prejudice when an intervenor does not seek to "reopen the merits" of a case. *Liggett*, 858 F.2d at 785–86 ("Numerous courts have allowed third parties to intervene in cases directly analogous to this one, many involving delays measured in years rather than weeks.") (listing cases); *Phillips*, 2007 WL 3245015 at *2 (prejudice was "not an issue" where the nonparty sought to intervene for the limited purpose of challenging a protective order and the case had been terminated for four years).

Mr. Barber likewise does not seek to reopen the merits of the *Aleksich* litigation, but instead seeks intervention for the sole purpose of obtaining public access to the court record in this case.  Any purported "prejudice" to Remington if Mr. Barber is permitted to intervene will be minimal because it will require Remington to address *only* the discrete and ancillary issue of whether the continued sealing of the court record is proper.  Moreover, the plaintiffs in the underlying action (the Aleksich family) support Mr. Barber's efforts.  Therefore, Mr. Barber's motion to intervene satisfies the second Rule 24(b) timeliness factor.

19

**C.    The Ongoing Public Safety Concerns Implicated by the Model 700 and Remington's Failure to Cease Production of the Dangerous Fire Control Counsel in Favor of Granting Mr. Barber's Motion.**

The third timeliness factor—the reason and length of any delay between the date when the record was sealed and the date when the party seeks to intervene to challenge the order—also favors intervention.

In cases, such as this, where the public's interest in court records may not have been apparent at the time those records were sealed, the public retains its ability to seek permissive intervention to challenge court secrecy when the need for such a challenge becomes known. As the Third Circuit has explained:

> [I]n cases dealing with access to information, the public and third parties may often have no way of knowing at the time a confidentiality order is granted what relevance the settling case has to their interests. Therefore, to preclude third parties from challenging a confidentiality order once a case has been settled would often make it impossible for third parties to have their day in court to contest the scope or need for confidentiality.

*Pansy*, 23 F.3d at 779-80. Thus, a delay—even in years—between the sealing of a court record and a petition for permissive intervention to challenge that sealing is justified when the intervenor or the public lacked sufficient knowledge of the case's significance at the time the protective order was entered.

In this case, there is ample justification for Mr. Barber seeking to intervene in *Aleksich* now:  he learned that, despite its CEO's promise to stop making the unsafe and flawed trigger mechanism, Remington continues to manufacture and sell bolt-action rifles with the same Walker fire control that killed Gus Barber. Given that the Ninth Circuit has stated that "delays measured *in years*" are

permissible when the public's right of access to court records is concerned, *San Jose Mercury News*, 187 F.3d at 1100-01 (emphasis added), the timing of Mr. Barber's motion to intervene is proper. Accordingly, the third timeliness factor counsels in favor of granting this motion.

In short, Mr. Barber has demonstrated that all three of the Ninth Circuit's timeliness factors counsel in favor of granting his motion to intervene. Thus, he has satisfied the first prerequisite for permissive intervention under Rule 24(b).

## II.   MR. BARBER'S MOTION TO INTERVENE SHARES A QUESTION OF LAW OR FACT IN COMMON WITH THE MAIN ACTION.

Mr. Barber also satisfies the second Rule 24(b) factor: *i.e.*, that his secrecy challenge "shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). This factor is construed liberally where a non-party is seeking intervention for the limited purpose of obtaining public access to court records. The reason for this, as the D.C. Circuit has explained, is "because of the need for 'an effective mechanism for third-party claims of access to information generated through judicial proceedings.'" *Nat'l Children's Center*, 146 F.3d at 1045–46. Thus, "despite the lack of a clear fit with the literal terms of Rule 24(b), *every circuit court that has considered the question has come to the conclusion that non-parties may permissively intervene for the purpose of challenging confidentiality orders.*" *Id.* at 1045 (emphasis added); *see also San Jose Mercury News*, 187 F.3d at 1103 (reversing district court order denying newspaper's motion to intervene so that newspaper could "press the public's right of access to discovery materials

pursuant to Federal Rule of Civil Procedure 26(c)"); *Beckman*, 966 F.2d at 473 (joining other circuits "in recognizing that Rule 24(b) permits limited intervention for the purpose of challenging a protective order"); *In re Beef Indust. Antitrust Litig.*, 589 F.2d 786, 789 (5th Cir. 1979) ("[t]here is no question" that Rule 24 intervention is "the procedurally correct course" for third-party challenges to secrecy orders).

Mr. Barber's request for permissive intervention here is akin to the request in *Pansy*, 23 F.3d 772. In *Pansy*, a group of newspapers sought intervention to unseal a secret settlement between a civil rights plaintiff and a police department. *Id.* at 776. The Third Circuit held that the newspapers could intervene even though they had not technically raised any "question of law or fact" in common with the original parties' claims or defenses. *Id.* at 778. In so ruling, the court "agree[d] with other courts . . . that the procedural device of permissive intervention is appropriately used to enable a litigant who was not an original party to an action to challenge protective or confidentiality orders entered in that action." *Id.* (listing cases). The court concluded that, "[b]y virtue of the fact that the Newspapers challenge the validity of the Order of Confidentiality entered in the main action, they meet the requirement of Fed. R. Civ. P. 24(b)(2) that their claim must have 'a question of law or fact in common' with the main action." *Id.*

Similarly, in *Jessup v. Luther*, 227 F.3d 993, 998 (7th Cir. 2000), the Seventh Circuit explained that the "common question of law or fact" prerequisite is met when the public or press seek to intervene for the sole purpose of challenging court secrecy because, "when a district court enters a closure order, the public's

22

interest in open access is at issue and that interest serves as the necessary legal predicate for intervention." In that case, the parties to the protective order opposed a newspaper's efforts to obtain public access to the terms of the settlement agreement the parties had reached. The court explained that, "[a]lthough the [p]arties take a very different view of the matter of confidentiality, nevertheless, that confidentiality is—in the language of Rule 24(b)(2)—a 'question of law . . . in common' between the Parties and the Newspaper." *Id.* at 999 (citation omitted). The Seventh Circuit therefore concluded that, when the district court sealed a portion of the court record pursuant to the parties' request, "the Newspaper's presumptive right to access was implicated, and the Newspaper should have been allowed to intervene for the limited purpose of challenging the district court's order." *Id.*

Under this accepted construction of Rule 24, nonparties seeking intervention for purposes other than "becoming parties to the litigation" on the merits do not need to satisfy the "strong nexus of fact or law" required for permissive intervention. *Beckman*, 966 F.2d at 473–74. Instead, non-merits intervenors satisfy Rule 24(b)'s requirements by opposing post-judgment confidentiality itself. *See Kamakana*, 447 F.3d at 1176 (allowing newspaper to intervene for limited purpose of challenging party's attempt to seal judicial record); *Rushford v. New Yorker Magazine*, 846 F.2d 249, 252 (4th Cir. 1988) (granting intervention to newspaper to unseal documents submitted in support of summary judgment motion); *Weiss v. Allstate Ins. Co.*, No. 06-3774, 2007 WL 2377116, *3 (E.D. La.

Aug. 16, 2007) (allowing public interest group to intervene to oppose sealing of trial exhibits).

In this case, Mr. Barber's interest in obtaining public access to the sealed *Aleksich* court record clearly suffices to show a question in common with the original action. Mr. Barber has therefore satisfied the second Rule 24(b) prerequisite for permissive intervention.

## CONCLUSION

Because Mr. Barber's Motion to Intervene satisfies both of the Ninth Circuit's factors for permissive intervention under Rule 24(b), the Motion should be granted.

DATE:   <u>October 21, 2011</u>   Respectfully submitted,

William A. Rossbach
ROSSBACH HART, P.C.

Amy Radon
Leslie A. Bailey
PUBLIC JUSTICE, P.C.

Richard Ramler
RAMLER LAW OFFICE, P.C.

*Attorneys for Intervenor Richard Barber*

24

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(A) of United States District Court Rules for the District of Montana, I certify that the word count calculated by Microsoft Word, is 6,399 words, excluding caption and certificates of service and compliance.

Dated this 21st day of October, 2011.

Respectfully submitted,

William A. Rossbach

*Attorney for Intervenor Richard Barber*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 21st day of October 2011, a true and correct copy of the foregoing document was forwarded by U.S. mail and email to the parties listed on the service list below.

Dale G. Wills
Steven E. Danekas
SWANSON, MARTIN & BELL LLP
330 North Wabash Avenue
Suite 3300
Chicago, IL  60611-3604
Phone: (312) 321-9100
Fax: (312) 321-0900
dwills@smbtrials.com

Anne E. Cohen
DEBEVOISE & PLIMPTON, LLP
919 Third Avenue
New York, NY  10022
Phone: (212) 909-6078
Fax: (212) 909-6836
aecohen@debevoise.com

*Attorneys for Defendants Remington Arms Co., Inc. and E. I. Dupont de Nemours & Co.*

Louis Aleksich
1216 West Aluminum
Butte, MT  59701

_____

William A. Rossbach

*Attorney for Intervenor Richard Barber*