**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION**

| | |
|---|---|
| LOUIS ALEKSICH, RAINELLE ALEKSICH, and BRENT ALEKSICH, | Cause No. CV-91-5-BU-PGH |
| Plaintiffs, | |
| v. | |
| REMINGTON ARMS CO., INC., and E. I. DuPONT DE NEMOURS & CO., | |
| Defendants. | |

## DECLARATION OF RICHARD BARBER IN SUPPORT OF HIS MOTION TO INTERVENE AND MOTION TO UNSEAL THE COURT RECORD

I, RICHARD BARBER, hereby declare as follows:

1.    I am over the age of 18 and reside in the State of Montana.

2.    I am competent to testify to the matters set forth herein based on my own personal knowledge.

3.    I am currently a resident of Manhattan, Montana and have lived in Montana for 44 years. As a Montana resident I have been involved in outdoor activities since I was 9 years old. These activities have included fishing, camping, recreational shooting, and later hunting after I graduated from hunter's safety education when I was 12. I am a member of the NRA and have owned and used firearms over the

1



duration of my entire adult life, which is a practice that continues today. I also enjoyed teaching my son, Richard "Gus" Barber, marksmanship skills prior to his death. Gus really enjoyed shooting a .22 rifle and pistol, and I taught him to target shoot with a pellet rifle and pistol at roughly the same age when my father taught me to shoot. I was looking forward to being involved in 4H shooting sports with Gus, which is what raised my interest in target shooting over and above the use of firearms for protection of our livestock, our personal security, and hunting. I am an active Montana Hunter Education instructor, and have been for the past eight years. I have earned certifications to possess five different states' concealed weapon permits, three of which are still in effect. I have plans to retest for the fourth, even though it is not required for me to do so to renew this permit. I am currently the director of training for a marksmanship academy here in Montana known as Augustis Ranch A.R.T.C. (Armed Response Training Center). Through this organization, I have had the privilege to teach women-only defensive pistol courses. I have been hired by a Montana Law Enforcement Agency to teach their SRT operators precision rifle target engagement at extended ranges, including basic precision rifle marksmanship. As an instructor, I am continually learning and developing new techniques. I vet and prove these developed methods and skills by attending various competitive events locally and out of state. In 2009 I made a "cold bore" shot that set a new record at the International Tactical Riflemen's

2

Championship. My partner and I placed a first round hit on a target at an engagement distance of 1800 yards. The following year I again proved this was not a fluke, by again hitting a target with two consecutive rounds at an engagement distance of 2000 yards. I have many contacts within the military and law enforcement sniper community that I train with and for, to promote long range shooting. My training activities also include training civilians from Montana as well as marksmen that come to Montana from other states to train at my facility.

4.    I bought a Remington Model 700 bolt action rifle because of its reputation for accuracy. When I researched the Model 700 before choosing a rifle, I had not seen or heard of any information warning of any potential defects or conditions that might subject my family to unnecessary risk.

5.    On October 23, 2000 my son Gus, who was nine years old, was mortally wounded after our Remington Model 700 bolt action rifle malfunctioned on a family hunting trip. In order to unload the rifle, it was necessary to first push the safety to the "off" safe position. As soon as my wife Barbara released the safety, the rifle discharged, expelling the bullet through our horse trailer and mortally wounding Gus, who had—without our knowledge—just seconds before, moved to the opposite side of the trailer. Barbara had not touched the trigger. Gus lived for only approximately one hour and fifteen minutes after being shot, despite our best efforts to save him.

6.    I first learned of the *Aleksich* litigation shortly after my son's death. In the

wake of Gus' death, I made a promise to Gus to learn the truth about what had

caused the rifle to inadvertently discharge. The first piece of information I obtained

was through no effort on my part. A local newspaper had published an article about

Gus's death, and the deputy with the Madison County Sheriff's Office who was

investigating the incident received a call from someone wanting to know the make

of rifle involved in the accident. (I later learned that the Sherriff's Office fielded

several more calls from people inquiring whether the rifle involved in Gus's death

happened to be a Remington rifle.) After the deputy confirmed to the caller that a

Remington bolt action rifle was involved in the death of Gus, the caller sent the

deputy a copy of a 1994 *Business Week* article entitled "Remington Faces a

Misfiring Squad." The deputy faxed the article to me. A copy is attached as Exhibit

1 to this declaration.

7.    The Business Week article stated that, as of 1981, there had been 12 jury

trials and 18 settlements in cases arising from Model 700s that had malfunctioned,

with an additional 11 lawsuits pending when the article went to print in 1994. I was

shocked to learn that there had been so many other incidents involving a Model 700

rifle firing without the trigger being contacted. I also soon learned from other news

articles that by the time Gus was killed in 2000, over 80 lawsuits had been filed

against Remington alleging that rifles containing the Walker fire control system had

fired without the trigger being contacted, causing deaths and injuries of the most severe nature.

8.      As friends and acquaintances stopped by our home to offer their condolences in the days after Gus' death, upwards of 14 different people approached me to say that they had experienced a similar malfunction with a Model 700 rifle. By the end of the 2000-01 Montana hunting season, our local newspaper had reported two additional accidents resulting in minor injuries caused by Model 700 malfunctions. I contacted the *Bozeman Daily Chronicle* reporter who was investigating the incidents, Kathleen O'Toole, and sent her the *Business Week* article. This prompted the *Chronicle* to investigate the history of the Model 700 and publish more articles about the defective nature of these rifles. I was interviewed for several of those articles. *See* Kathleen O'Toole, "Remington Rifle Involved in Growing Number of Accidents," *The Bozeman Daily Chronicle* (Nov 4, 2000); "Family Takes Aim: Tragedy of Fatal Shooting Attracts Attention Of National Media," *The Bozeman Daily Chronicle* (Jan. 18, 2001). Copies of these articles are attached as Exhibits 2 and 3 to this declaration.

9.      As a result of this media attention, I started receiving phone calls and letters from other Montana residents who described similar malfunctions with Remington rifles, including the Model 700. I would estimate that I received in excess of 150 letters from Montana residents alone and as many as 20 phone calls from other

5

Montana sportsmen, including one man who had been shot in the arm with a Model 700 rifle by a friend shortly after Gus' death.

10. At the time of Gus' death, I was a small business owner. I owned and operated a multi-division construction firm which included consulting services to other larger firms. My business included residential construction and land investment, as well as residential and commercial specialized contractor services. Following the shooting accident, I held an employee meeting where I told my employees about the loss of Gus and that I would be suspending operations for a period of time to collect myself. I also showed them the *Business Week* article.

11. One of my employees had gone to school with the Aleksich brothers, Brent and Brock, and he told me that they had had a strikingly similar incident involving a Remington Model 700 rifle. The employee put me in contact with an Aleksich family member who confirmed that 14-year-old Brent Aleksich was shot through both legs when the family's Model 700 rifle fired as 13-year-old Brock released the safety while on a family hunting trip in 1988. That incident gave rise to the *Aleksich* litigation.

12. At that same employee meeting, two other employees told me that they, too, had experienced malfunctions with Model 700 rifles that resulted in the rifle firing without trigger contact. One employee reported that his Model 700 had fired when

he pushed the safety to the "off" position to unload the rifle. That incident happened on the very same day Gus was killed.

13.     After hearing so many first-hand accounts of malfunctions involving Remington bolt action rifles, including the Model 700, it became readily apparent to me that what had happened to my family was by no means an isolated incident. At that point, I set out to learn everything I possibly could about the Model 700 rifle, in particular how our rifle could have fired without the trigger being contacted to initiate the fatal discharge. I felt that if anyone on earth was entitled to know the truth, it was me. I still believe this today.

14.     I was compelled from what I had learned early on to dedicate myself to researching the history, function and design of the Model 700 through the systematic collection of evidence. I knew it would be important for me to be objective—to approach the information I found not as a father who had lost a son, but as an investigator looking for and determined to find the truth. In order to do this, I had to detach myself emotionally from the issue. As I will explain below, once I started uncovering information about the Model 700's propensity to inadvertently discharge, including manufacturing defects, compounded by deeper underlying design defects (and Remington's knowledge of those defects and malfunctions), I made it my mission to educate the public and ultimately to do everything I could to prevent what happened to Gus from happening to anyone else.

I believe I am bound by a moral obligation to use the knowledge I have acquired to educate the gun bearing public through the news media about the hazards of Remington's dangerous products as an educational resource.

15. When I first started my investigation into the Model 700's history, I was able (at my own expense) to obtain copies of several volumes of material from the *Aleksich* litigation that had been provided to the litigants in a separate case, *Nigro v. Remington Arms Co., Inc.*, 637 A.2d 983 (Pa. Super. Ct. 1993). To the best of my knowledge, Richard Miller, the attorney who represented the Aleksich family, provided these materials to the plaintiffs in *Nigro* before the *Aleksich* court file was sealed. Included in the materials is a redacted copy of a brief in the *Aleksich* case in support of a motion for sanctions against Remington for abusing the discovery process and an impressive quantity of supplemental exhibits filed with that motion.

16. In addition, on a number of occasions starting in 2001, the clerk of this Court permitted me to review pleadings and briefs that had been filed with the Court in *Aleksich*. On each occasion I was accompanied by an attorney to assist me with the process. I was overwhelmed by the volume of material I saw, most of which was mundane motions and filings. I also learned from the *Nigro* documents and evidence that within weeks of when the *Aleksich* trial was scheduled to begin, Remington informed the plaintiffs' counsel that it had discovered eight to twelve bankers' boxes of documents that were responsive to discovery requests that the

8

plaintiffs had filed at least three years previously. I believe that much of this discovery material was filed with this Court as attachments to pleadings.

17.    Over the past 11 years, I have personally reviewed internal Remington documents, memos, committee meeting minutes, testing records, research and development records, design change requests, process record change authorization forms, depositions of Remington representatives, customer complaints, and gun examination reports. I have also researched and reviewed numerous complaints filed with various courts, law enforcement investigation reports, and legal briefs and motions ranging in the millions of pages of documents.

18.    Through this research, I discovered that Remington bolt action rifles that contain the "Walker" fire control (named after the engineer who created the design in the 1940s, Merle H. "Mike" Walker) can, in fact, discharge without the gun handler contacting the trigger. "Fire control" is the technical term to describe the trigger mechanism that controls when the rifle is fired. I also learned that Remington has been aware of this problem for at least 60 years. The following paragraphs provide a brief overview of the knowledge I have obtained from my research.

19.    The Walker fire control was designed with an additional internal part called a trigger connector. The connector is not affixed to the trigger in any way. Instead, it is held in place only by the trigger return spring and the side plates of the housing.

This means that after each firing cycle of the rifle, the connector separates from the trigger body, creating a gap between the two individual parts. Contaminants such as field debris, manufacturing scrap, or burrs from the manufacturing process can become trapped inside the enclosed fire control housing or can build up over time, and can interfere with the reliable function of the trigger mechanism by preventing the connector from returning to a secure and reliable sear support position. Other factors can also increase the likelihood of a malfunction in the Walker fire control.

20.     The trigger connector feature in the Walker fire control is unique in the world of firearms and exclusive to Remington bolt action rifles alone. The reason Remington used the trigger connector is for ease of manufacture and to reduce manufacturing costs. This unique feature has been used in every center-fire bolt action rifle that Remington has produced since March 1948, with the exception of the Model 788. The Model 700 contains the Walker fire control. Other models with the Walker fire control include the Army M/24 Sniper Weapon System; the M/40-A1 Sniper Weapon System; M/40X, 600, Mohawk 600, M/660, XP-100, 7, 710, 721, 722, 725, and 770; and the "Mountain Rifle." I have become aware that most of these models have suffered from similar forms of malfunctions described in the following paragraphs.

21.     The Walker fire control can malfunction in a variety of ways. The most common form of malfunction is what Remington terms a "fire on safety release," or

10

"FSR." This is the malfunction that was involved in my son's death. An FSR can occur when the gun handler releases the safety to fire the rifle or, as in our case, when the safety is released to unload the rifle. Early Model 700s manufactured before February 26, 1982 (like ours) were designed with a bolt lock feature that prevented the bolt from being raised to extract the loaded cartridge from the chamber, requiring the gun handler to first push the safety forward to the "off" safe position before the unloading process could begin.

22. Other malfunctions associated with the Walker fire control design include the propensity to fire when jarred ("JO"), fire when the bolt is opened ("FBO"), fire when the bolt is closed ("FBC"), and fail to fire when the trigger is intentionally pulled to discharge the rifle ("fails to fire"). If a rifle fails to fire when the trigger is pulled, it may then fire when the bolt is touched or moved. (See, CNBC "Remington Under Fire", Portland Maine Police Incident, Exhibit 5). Remington engineers examining rifles returned by customers with a safety-related complaint or during routine testing documented these malfunctions and attributed them to the failure of the trigger connector to return to a secure and reliable sear support condition for various reasons, or as a result of design, construction, or assembly deficiencies.

23. In addition to learning all I could about the history, development, function and design of the Walker fire control system and the characteristics that make this design prone to the failures described above, I also learned how Remington

11

routinely handles safety-related complaints involving Model 700 rifles. I have talked to countless people who notified Remington about malfunctions they experienced, including other victims and surviving family members seeking answers for themselves as I once did. As a result of these conversations, as well as through my review of materials I have collected from various sources (including Remington itself) regarding the question of the potential safety of Remington bolt action rifles, I learned Remington continues to deny to the public any knowledge of the propensity of rifles equipped with the Walker fire control to fire without a trigger pull, even though this contradicts what they candidly admit in their own internal documents. Remington routinely attempts to shift the blame for the malfunctions to its customers.

24.     As near as I can determine, since *Aleksich*, Remington has settled almost every claim brought against the company involving the Model 700. Remington routinely requires a broad protective order before it will produce any documents in litigation, and then settles claims on the condition that the court seal all evidence to prevent the public from learning what Remington knew, when they knew it, and what they did or did not do regarding the unsafe nature of the Walker fire control. I believe the entire *Aleksich* court file was sealed after 2001 at Remington's request to hide the company's misconduct and to prevent the disclosure of Remington's damaging, self-impeaching documentation from the public.

25.    In 2001, I contacted the Montana Hunters' Education Safety Coordinator, Mr. Baumiester, to research past hunting-related accident reports in an attempt to determine whether Remington rifles had been involved in any of these reported accidents. If memory serves me correctly, I found that of the roughly 130 accidents reported in the preceding 15 years, about 30 involved Remington rifles. When I told Mr. Baumiester what I had learned about the Walker fire control and showed him some Remington documents that I had accumulated, he seemed genuinely concerned for the safety of Montana hunters. Later, he requested my help in suggesting improvements to the hunter safety training program, including revising the hunter's education manual and curriculum to better educate new gun handlers about basic firearm design and function.

26.    I also made a similar inquiry to the Wyoming Game and Fish safety coordinator, Helen McCracken, who provided information to me about accidents in the 2000-01 hunting season. What we discovered was alarming: of the five relevant accidents that occurred during the season, Remington rifles had been involved in at least three of them. From these sources in Montana and Wyoming and from speaking to Richard Miller—the attorney who had represented the plaintiffs in the *Aleksich* case and who would later become my attorney and trusted friend—I confirmed two deaths (including Gus') and six injuries involving Remington rifles during the 2000 – 2001 hunting season alone. Since Gus' death, I have become

aware of roughly 42 more reported deaths and injuries related to the Walker fire control that have resulted in further litigation against Remington.

27.   As I started to learn more, I began reaching out to the media in an attempt to bring public awareness to millions of unsuspecting gun owners about the dangers of the Walker fire control. This was my attempt to reduce firearm-related accidents involving Remington rifles through education. In 2001, I was interviewed by CBS Evening News *Eye on America* for a three-part series with Jim Stewart, produced by Tom Flynn. The three segments of the series—entitled "A Deadly Flaw," "Fixing a Fatal Flaw," and "Remington Model 700: Friend or Foe"—were broadcast nationwide. I spoke about our incident and described what I had begun to learn about the Walker fire control. Richard Miller was also featured in this series. A copy of the transcript of one of these interviews is attached as Exhibit 4.

28.   That was only the beginning. Over the past 11 years, I have worked to educate the public about the Model 700's history and Remington's knowledge of problems. The number of news stories in which I am quoted is too voluminous to list here, as a Google search of "Richard Barber" with the word "Remington" yields literally thousands of hits. Most recently, I was interviewed by Scott Cohn for the CNBC Original Documentary "Remington Under Fire: A CNBC Investigation" (Oct. 20, 2010), portions of which also aired on NBC Nightly News on the same date. A copy of the CNBC documentary is attached in its entirety on a DVD as

14

Exhibit 5. CNBC aired an updated version of the documentary on August 5, 2011. I was also featured in *USA Today* for a story entitled "Death, Injuries Raise Questions for Popular Remington Model 700 Rifle," which is attached as Exhibit 6. In just the past few months, *The Billings Gazette*, *The Missoulian*, and *The Ravalli Republic* ran a feature story by reporter Perry Backus about my continued research and my personal efforts to educate the public about the Model 700's inherent dangers entitled "Montana Father on Quest for Answers in Fatal Remington Rifle Firing" (Apr. 30, 2011). This article is attached as Exhibit 7.

29. In addition to educating the public, I was determined to try to persuade Remington to fix the problems with its Walker fire control system. I initially had no interest in filing a lawsuit of my own because of my fear that Remington could attempt to use the court to silence me with a court order preventing me from discussing what I had learned. I began working with a local attorney Richard Ramler and one of the attorneys for the Aleksich family, Richard Miller. With the aid of my attorneys, I entered into negotiations with Remington representatives. These negotiations took place in a series of meetings that began in early 2001 (at Remington's request), and continued through March 2002, by which time my family and I had filed a lawsuit against Remington and Dupont, which was Remington's old parent company.

15

30.    My lawsuit, case number 2:01-cv-00083-CSO in this Court, was filed in

December 2001.  As I explained to reporters, my goal was do everything I could to

draw public awareness to what I was beginning to understand was (and is) a deadly

flaw in these rifles. *See* Kathleen O'Toole, *Remington Under Fire: After Fatal*

*Accident, Family Back to the Hunt*, Bozeman Daily Chronicle (Dec. 2, 2001)

(Exhibit 8); Kathleen O'Toole, *Family Sues Gun Maker*, Bozeman Daily Chronicle

(Feb. 18, 2002) (Exhibit 9).

31.    I decided to use the leverage of my family's lawsuit to attempt to compel the

company to remove the bolt locks on Model 700s produced prior to February 26,

1982. As I explained above, the design of these models forced gun handlers to

release the safety in order to unload the rifle, as my wife Barbara had done.  By the

time Remington stopped manufacturing the Model 700 with the bolt lock feature in

1982, it had produced approximately 2.5 million rifles with this defect.  We were

successful in convincing Remington to take the necessary action:  in 2002,

Remington agreed to implement a "Safety Modification Program."  Through this

program, rifle owners could pay a small fee to have the bolt lock removed in order

to help prevent future accidents caused by the fire on safety release "FSR"

malfunction.  Remington's public announcement about that program is attached as

Exhibit 10.

16

32.     My second goal was to convince Remington to discontinue use of the Walker fire control system. In order to do that, Remington would first need to develop a suitable safer alternative design. I met with Remington CEO Tommy Millner, as well as Remington's lead defense counsel Dale Wills and attorney Anne Cohen, on at least four different occasions in 2001 and 2002 regarding the Safety Modification Program and Remington's development of a new fire control. During one of our meetings, Tommy Millner assured me that once the new fire control went into production, Remington would discontinue use of the Walker fire control. This agreement was finalized on a handshake between Tommy Millner and me in Butte, Montana in the spring of 2002.

33.     At the invitation of Remington CEO Tommy Millner, I provided feedback to Remington on the strengths and weaknesses of various design proposals based on knowledge and insight that I had gained from Remington's own documents, including recommendations and directives made by past design engineers. I went into these discussions with the belief that the public has every right to expect more from what Remington describes as the most popular bolt action rifle in America, not less in the way of safety. Remington ultimately developed a new safer alternative trigger mechanism which later became named the "X-Mark Pro." The X-Mark Pro finally eliminated the need for the unreliable trigger connector in the Walker fire control, instead utilizing a one-piece trigger construction that was a Remington

17

design goal since the 1970s, as well as adding a trigger blocking mechanism: a design feature that had been originally recommended by Remington's lead design engineer Mike Walker in 1948, again in 1978, and once again in 1982.

34.     In 2005 I received an exclusive invitation to the Remington Research and Development facility in Elizabethtown, Kentucky. While at that facility, I was permitted to review the designer's models that were under development to replace the Walker fire control system and to disassemble, inspect, and test fire the new design. Later that year, Remington sent me a Model 700 rifle that had been retrofitted with the X-Mark Pro fire control. I was asked to evaluate and make recommendations to the company before the new design went to production.

35.     Rifles with the X-Mark Pro were first released to the public in December 2006. I believed until very recently that Remington had, as agreed, stopped manufacturing and selling the Walker fire control when the X-Mark Pro went into production. But when I saw the CNBC piece "Remington Under Fire" in the Fall of 2010, I realized that Remington continues to maintain that the Walker fire control is safe and reliable and still manufactures and sells Model 700s with the Walker fire control. I was shocked. This realization motivated me to step up my efforts to do my part to educate the public concerning the dangerous conditions that exist in the Walker fire control. I feel Remington's recent conduct has left me no choice but to

step up to the plate to expose Remington's efforts to keep the defects (and its knowledge of these defects) a secret from the public.

36. As I began to understand how Remington had kept the truth about its dangerous rifles from becoming public by making information exchanged in lawsuits confidential, I became increasingly frustrated and determined to do something. In 2003, I proposed a law to the Montana Legislature that would prohibit state courts from entering orders with the purpose or effect of concealing a public hazard. During two legislative sessions—in 2003 and again in 2005—I worked to secure passage of the "Gus Barber Anti-Secrecy Act." In 2005, the Governor signed that bill into law, and it is now part of the Montana Code, Title 2, Chapter 6, Section 112. A *Bozeman Daily Chronicle* editorial about the law is attached as Exhibit 11.

37. With that goal now behind me, I focused my attention back to my research and the *Aleksich* case. But when I attempted to re-visit the *Aleksich* case file in 2005, I was informed by the clerk that the files had been shipped to a storage facility in Colorado and that I would have to make a formal request in writing and pay a fee to have the case files returned. Later I was informed that I could no longer access the file because the entire contents of the case were under seal. On October 12, 2011, I again contacted the Clerk of the Court personally to request access to the *Aleksich* case files. I was again denied access and was informed that the entire

19

record is sealed and that it is no longer in the custody of the clerk of the federal court in Butte. The clerk could not answer my question of when the entire record was sealed.

38.    I am now asking this Court to unseal the court record in *Aleksich* because of what I suspect is contained in that record. From the documents I obtained from the *Nigro* litigation, I learned that the *Aleksich* court file has by far the most extensive and compelling collection of documents regarding the Walker fire control—and Remington's knowledge of the fire control's propensity to malfunction.

39.    I have dedicated my life to learning everything I can about the facts associated with the Model 700 and the Walker fire control. I have worked to educate other gun owners about this dangerous product by writing articles and informational posts on the Internet, speaking publicly, and being featured in countless news reports. By my best estimate, I have spent several thousand hours and made a sizable contribution from my own personal finances in my efforts to collect this information. But despite all this, none of my work so far has enabled me to achieve my primary goal—to ensure that no one else has to go through what my family goes through every year. As time passes, I have continued to hear about injuries and deaths caused by inadvertent discharges from Remington rifles. In fact, just this past year, I was contacted by several families, including a member of the

Holt family, who lost their 13-year-old son Trenton just weeks before Christmas just last year. A copy of a news story about this incident is attached as Exhibit 12.

40.     Another compelling story that sticks out in my mind is an incident that occurred when a father was attempting to unload a Remington Model 700 rifle. When the safety was pushed to the "off" safe position (a familiar story), the rifle suddenly and unexpectedly discharged, striking their young son in the leg. The boy almost died. Years later, the family sent the rifle back to Remington to take advantage of the Safety Modification Program I had secured in 2002. (See paragraph 31 and Exhibit 10.) The family was completely unaware of the history of the Model 700 rifle until they happened to see the CNBC documentary last year. After the documentary aired, the wife called me. During our conversation she handed the phone to her husband, the father who had accidentally shot his son. We talked about the rifle, which he had returned to Remington for inspection and removal of the bolt lock. He was trying to understand the cause of their accident, knowing that he did not touch the trigger at the time the rifle discharged. We decided that I would describe to him how to perform one of Remington's own functional tests to verify that any potential defects had been addressed under the terms of the Safety Modification Program. As I described how to manipulate the trigger connector as Remington's own testing protocol details, he released the safety (with an empty chamber). The rifle malfunctioned, releasing the firing pin without

21

trigger contact, when the safety was released. I could hear his wife in the background screaming and weeping when she witnessed the rifle firing on safety release in her presence. Unfortunately, this family—as well as many more families I am aware of—has no legal recourse for the injuries they sustained, because their statute of limitations has expired. As I hung up the phone, I was struck by how effective Remington has been in hiding the dangers associated with their bolt action rifles over the course of many years. As the anniversary date of Gus' death draws close (October 23, 2000), I am again reminded that the Montana hunting season is about to begin and so this cycle will continue another year. I am forced to wonder how many more lives will be shattered, how many more people will be maimed or killed as a result of this safety issue that I see as a preventable event in part through education of the facts.

41. I believe that the only way I will achieve my initial goal of preventing future loss of life and limb will be to convince Remington to finally issue an adequate public warning regarding the dangerous nature of the Walker fire control and to recall the reported five million Model 700 rifles it boasts producing since 1962 and replace the defective Walker fire control with the X-Mark Pro. It is my great hope that once the *Aleksich* court record is unsealed, the public will finally be able to see the truth: that Remington has known about these dangerous malfunctions in its rifles since the 1940s, and that Remington has engaged in monumental efforts to

22

keep the defects—and its knowledge of these defects—a secret. I believe that this widespread public attention and condemnation are the only factors that will motivate Remington as a result of public awareness to finally do the right thing. Even if unsealing the *Aleksich* court file does not prompt a recall, at least the public will have access to critical information that will finally allow them to make well informed decisions regarding the safety of this product.

42.    I do not want another unsuspecting family to suffer the pain we have to endure because Remington is able to hide the dangerous nature of these rifles behind a blanket guarantee of court secrecy. As long as the *Aleksich* court records remain sealed and locked away, people will continue to be subjected to unnecessary risk and Remington will be able to continue lying to the public. It has been 16 years since the *Aleksich* case settled. It has been 11 years since the unnecessary loss of my son Gus. How many more lives will be lost, how many more lives ruined by Remington's efforts to protect its bottom line at the expense of the public? Simply stated, this is not an "anti-gun" issue; this is a gun safety issue. I can only hope and pray that someday the truth will prevail and these documents shall once again see the light of day, to perform their intended function—to speak for themselves so the public may finally learn the truth. Then and only then will the public be able to make wise and informed decisions and take responsibility for their own personal safety, and that of their friends and family. I

can only wish I had this option available to me 11 years ago, or knew a fraction of what I know today, that has only been gained through great sacrifice. This Court ultimately holds the key to this knowledge—knowledge that could be the difference between life and death in the months and years to come, as only education of these facts can break this cycle.

43.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 20 October, 2011

*Richard D Barber*
RICHARD BARBER


Subscribed and Sworn to before me a notary public for the State of Montana this 20th day of October, 2011.

*[signature]*

Notary Public for the State of Montana
Residing at: Bel. Co, MT
My commission expires: 12/12/2014

RICHARD A. RAMLER
NOTARY PUBLIC for the
State of Montana
(SEAL) Residing at Belgrade, Montana
My Commission Expires
December 12, 2014